IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FLOWERS BAKERIES BRANDS,
INC.,

    Plaintiff,

      v.

INTERSTATE BAKERIES
CORPORATION,

    Defendant.

CIVIL ACTION FILE
NO. 1:08-CV-2376-TWT

## ORDER

This is a trademark infringement action.  For the reasons set forth below, the

Court DENIES the Plaintiff's Motion for Partial Summary Judgment as to Liability

Issues [Doc. 120]; GRANTS the Plaintiff's Motion for Partial Summary Judgment as

to the Defendant's Affirmative Defenses [Doc. 119]; and DENIES the Plaintiff's

Motion for Partial Summary Judgment as to an Accounting of Defendant's Profits

[Doc. 121].

## I.  Background

Flowers Bakeries Brands, Inc. sells bread and other baked goods under the

brand name NATURE'S OWN.  Flowers has three different federal trademark

registrations for the NATURE'S OWN mark, and has been selling baked goods under

that brand name since 1976.  In 2008, Interstate Bakeries Corporation developed a new line of baked goods products to be sold under the brand name NATURE'S PRIDE.  In July 2008, before NATURE'S PRIDE was launched, Flowers filed this trademark infringement action against Interstate Bakeries Corporation.  In its complaint, the Plaintiff asserts federal law claims for trademark infringement and unfair competition and state law claims for trademark dilution, unfair competition, and deceptive trade practices. [Doc. 21-2].

Notwithstanding the lawsuit, the Defendant proceeded with its launch of NATURE'S PRIDE line of baked goods.  By February 2009, the Defendant was selling and advertising NATURE'S PRIDE throughout most of the United States. Meanwhile, this litigation continued, and the parties engaged in discovery and other pre-trial matters.  The Plaintiff has filed several motions for summary judgment which are now before the Court.  The Plaintiff moves for summary judgment as to the Defendant's liability, the Defendant's affirmative defenses, and the Plaintiff's  right to recovery of the Defendant's profits.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

### A.   Liability

The Plaintiff moves for summary judgment as to the Defendant's liability for all of the Plaintiff's claims, except for the state law dilution claim.  For that claim, the Plaintiff says that "[b]ecause the relief between [the Plaintiff's claims] is co-extensive, [the Plaintiff] withdraws its motion for its dilution claims."  (Reply Br. in Supp. of Pl.'s Mot. for Partial Summ. J. as to Liability Issues, at 28 n.43.)  To establish trademark infringement, the Plaintiff must show that it has a valid trademark in NATURE'S OWN and that the Defendant's use of NATURE'S PRIDE is likely to cause confusion.  See 15 U.S.C. § 1114(1); Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999).  The same requirements apply to the Plaintiff's claims for unfair competition and deceptive trade practices.  See Amstar

Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 258 (5th Cir. 1980)[1] ("The same test is applicable to the deceptive trade practices claim and common law unfair competition.") (citations omitted).

The Plaintiff has a valid trademark in NATURE'S OWN.  Through its continuous use of NATURE'S OWN, the Plaintiff's right to use the trademark has become "incontestable."  See 15 U.S.C. § 1065.  Because the Plaintiff's right to use the trademark has become incontestable, "the registration shall be conclusive evidence of the validity of the registered mark."  15 U.S.C. § 1115(b).  The Defendant does not dispute the validity of the Plaintiff's trademark.

That leaves whether the Defendant's use of NATURE'S PRIDE is likely to cause confusion.  In the Eleventh Circuit, seven factors are relevant in deciding whether there is a likelihood of confusion: (1) strength of mark, (2) similarity of marks, (3) similarity of products, (4) similarity of customers, (5) similarity of advertising, (6) defendant's intent, and (7) actual confusion.  See Frehling, 192 F.3d at 1335.  "Although the likelihood of confusion is a question of fact, the court, on a motion for summary judgment, is obligated to examine all the evidence and draw therefrom all reasonable inferences."  Rolls-Royce Motors, Ltd. v. A & A Fiberglass,

---

[1]Decisions of the former Fifth Circuit entered before October 1, 1981, are binding as precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Inc., 428 F. Supp. 689, 694 (N.D. Ga. 1977) (citations omitted).  "This is not to say that summary judgment is necessarily appropriate in all [actions] for trademark infringement or even in the majority of them."  Id.

After considering the seven factors, the Court concludes that there are genuine issues of material fact as to whether the Defendant's use of NATURE'S PRIDE is likely to cause confusion.  The Court will discuss each factor individually.

      1.   <u>Strength of Mark</u>

The strength of a trademark "refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source."  <u>McGregor-Doniger, Inc. v. Drizzle, Inc.</u>, 599 F.2d 1126, 1131 (2d Cir. 1979).  "The stronger the mark, the greater the scope of protected accorded it, the weaker the mark, the less trademark protection it receives."  <u>Frehling</u>, 192 F.3d at 1335.  Factors that influence the strength of a trademark include the type of mark, whether the mark is incontestable, and the commercial strength of the mark.  <u>See</u> <u>id.</u> at 1335-37.

There are four categories of marks, and these categories influence the strength of a mark.  From weakest to strongest, the categories are "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary."  <u>Id.</u> at 1335.  Generic marks describe the type of the goods or services provided.  LIQUOR STORE is a generic mark when used to sell

liquor.  Id.  Generic marks are weak marks and are not entitled to any legal protection.

Descriptive marks describe a characteristic or quality of the goods or services

provided.  Id.  TASTY is a descriptive mark when used to sell bread.  See 2 J. Thomas

McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:18, at 11-33 (4th

ed. 2010).  Descriptive marks, though stronger than generic marks, are still weak

marks and are not entitled to legal protection unless the owner can show that the mark

has acquired "secondary meaning."  Safeway Stores, Inc. v. Safeway Discount Drugs,

Inc., 675 F.2d 1160, 1165 n.9 (11th Cir. 1982).  Suggestive marks, relying on the

imagination of the consumer, suggest a characteristic or quality of the goods or

services provided.  See Dieter v. B & H Indus. of Sw. Fla., Inc., 880 F.2d 322, 327

(11th Cir. 1989).  PENGUIN is a suggestive mark when used to sell refrigerators.  See

Frehling, 192 F.3d at 1335.  Arbitrary marks have no relationship to the goods or

services provided.  See id.  KODAK is an arbitrary mark.  See Amstar, 615 F.2d at

260.  Suggestive and arbitrary marks are strong marks and are entitled to legal

protection regardless of whether the owner has shown that the mark has acquired

secondary meaning.  See Safeway Stores, 675 F.2d at 1165 n.9.

The Plaintiff says that NATURE'S OWN is a suggestive mark.  The Defendant

disagrees and says that it is a descriptive mark.  It says that the word NATURE'S is

"commonly used to communicate the concept of healthy, all natural, and similar

product characteristics associated with the dictionary word 'Nature's.'" (Def.'s Mem. of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 17.)  To support its argument, the Defendant points to more than eighty federal trademark registrations by third parties for bread and related products that use the word NATURE'S in the mark. (Exs. to Pl.'s Mots. for Summ. J., Ex. 152, Exs. 2-3); (Exs. to Pl.'s Mots. for Summ. J., Ex. 190, at 6-7.)  "Third party registrations are relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that the segment is relatively weak."  2 McCarthy, supra, § 11:90, at 11-208.  The Defendant's evidence shows that there are genuine issues of material fact as to whether NATURE'S OWN is a suggestive or descriptive mark. See id. § 11:3, at 11-9 ("The vast majority of courts has held that categorization of a term on the spectrum of distinctiveness is a factual issue . . . .").  Indeed, this evidence by itself is sufficient to deny summary judgment to the Plaintiff because, if NATURE'S OWN is a descriptive mark, then the Plaintiff must also show that it has acquired secondary meaning.  The Plaintiff has not made such a showing.

The Plaintiff says that third party registrations are irrelevant without evidence of how the marks are being used.  But the Plaintiff ignores the difference between third party registrations and third party uses.  It may be true that "[t]he mere citation

of third party <u>registrations</u> is not proof of third party <u>uses</u> for the purpose of showing a crowded field and relative weakness."  2 McCarthy, § 11:89, <u>supra</u>, at 11-204; <u>see also</u> <u>Turner v. HMH Pub. Co.</u>, 380 F.2d 224, 228 n.2 (5th Cir. 1967).  But "a real evidentiary value of third party registrations per se is to show the sense in which a term, word, prefix or suffix of a mark is used in ordinary parlance.  That is, third party registrations are similar to dictionaries showing how language is generally employed."  2 McCarthy, <u>supra</u>, § 11:90, at 11-208; <u>see also</u> <u>Institut Nat'l Des Appellations D'Origine v. Vintners Int'l Co., Inc.</u>, 958 F.2d 1574, 1582 (Fed. Cir. 1992); <u>Spraying Sys. Co. v. Delavan, Inc.</u>, 762 F. Supp. 772, 778 (N.D. Ill. 1991).  Here, the Defendant has presented third party registrations to show that NATURE'S is "commonly used to communicate the concept of healthy, all natural, and similar product characteristics associated with the dictionary word 'Nature's.'" (Def.'s Mem.  of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 17.)  For that purpose, the Defendant does not need to also present evidence of how the marks are being used.

Another factor that influences the strength of a trademark is whether the mark is incontestable.  "[I]f a mark is 'incontestable,' . . . then the mark's incontestability serves to enhance its strength."  <u>Frehling</u>, 192 F.3d at 1336; <u>see also</u> <u>Dieter</u>, 880 F.2d at 329.  As discussed above, the Plaintiff's right to use NATURE'S OWN has become incontestable.  <u>See</u> 15 U.S.C. § 1065.  The Defendant does not dispute this.  But this

fact, by itself, does not conclusively establish that NATURE'S OWN is a strong mark. It must be weighed against the other factors that influence the strength of a mark.  See World Triathlon Corp., Inc. v. Dawn Syndicated Prods., No. 8:05-CV-983-T-27EAJ, 2007 WL 2875456, at *4 (M.D. Fla. Sept. 28, 2007) ("[I]ncontestability is the doctrine that a registered trademark is presumed to be distinctive, which is the strongest type of mark, but this does not mean that a mark's strength cannot be attacked."); Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 632 (6th Cir. 2002) ("Even where a trademark is incontestable and 'worthy of full protection,' the significance of its presumed strength will depend upon its recognition among members of the public.").

The commercial strength of the mark also influences the strength of a trademark.  "The commercial-strength inquiry . . . looks at the marketplace and asks if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise."  See CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 269 (4th Cir. 2006) (quotation marks omitted).  The Plaintiff says that NATURE'S OWN is a commercially strong mark.  It points to the fact that "NATURE'S OWN is the best-selling brand by volume of soft variety bread in the United States" and that "$267 million has been spent on marketing, advertising and promotion since 1981."  (Br. in Supp. of Pl.'s Mot. for Partial Summ. J. as to Liability Issues, at 13-14.)  This is

relevant evidence of the commercial strength of its mark.  See Hester Indus., Inc. v. Wing King, Inc., No. 1:91-CV-2644-RHH, 1992 WL 200129, at *3 (N.D. Ga. Mar. 26, 1992) ("It is well-established that the strength of a mark may be increased by virtue of long use and extensive promotion.") (quotation marks omitted).

In response, the Defendant says that third party uses of similar trademarks for bread products show that NATURE'S OWN is a commercially weak mark.  See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1722, 396 F.3d 1369, 1373 (Fed. Cir. 2005) ("Evidence of third-party use of similar marks on similar goods is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection."); 2 McCarthy, supra, § 11:88, at 11-199-200 ("The purpose of a defendant introducing third party uses is to show that customers have become so conditioned by a plethora of similar marks that customers have been educated to distinguish between different such marks on the basis of minute distinctions.") (quotation marks omitted).  The Defendant points to four different bread products – NATURE'S PROMISE, NATURE'S CHOICE, NATURE'S GRAIN, and NATURE'S CUPBOARD – that are sold in stores that also sell NATURE'S OWN. This evidence shows that there are genuine issues of material fact as to whether NATURE'S OWN is a commercially strong mark.

The Plaintiff says that those four brands are merely store brands and that consumers perceive national brands like NATURE'S OWN and NATURE'S PRIDE differently from store brands.  The Defendant disagrees.  It says that store brands are an important part of the market, accounting for "approximately 40% of all unit bread sales in [the Plaintiff's] core territory."  (Def.'s Mem. of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 4.)  Again, the Defendant's evidence shows that there are genuine issues of material fact as to whether NATURE'S OWN is a commercially strong mark.

### 2.    Similarity of Marks

The more similar the marks, the more likely the marks will be confused.  "In evaluating the similarity of marks, [courts] must consider the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed."  E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imps., Inc., 756 F.2d 1525, 1531 (11th Cir. 1985).  Moreover, "[t]hough the marks must be compared, they must be compared in light of what occurs in the marketplace, not in the courtroom."  James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 275 (7th Cir. 1976).

The Plaintiff says that NATURE'S OWN and NATURE'S PRIDE are very similar marks because they both share the word NATURE'S.  It says that NATURE'S

is the dominant word in both marks.   See <u>Gilbert/Robinson, Inc. v. Carrie</u> <u>Beverage-Missouri, Inc.</u>, 758 F. Supp. 512, 523 (E.D. Mo. 1991) ("Where a trademark contains a dominating or distinguishing word, and where the purchasing public has come to know and designate the article by such dominating word, the use of such word by another in marking similar goods may constitute infringement although the latter mark aside from the dominating word may be dissimilar.").   And it says that NATURE'S creates an identical "health and wellness" impression for both marks. (Br. in Supp. of Pl.'s Mot. for Partial Summ. J. as to Liability Issues, at 16.)   The Plaintiff says that the differences between OWN and PRIDE are immaterial because NATURE'S has an overwhelming effect.   It points to the Defendant's own documents to show that the Defendant only really cared about the NATURE'S part of the mark, even switching from NATURE'S CHOICE (its first choice) to NATURE'S PRIDE (its second choice) without any problems.   (Simmons Decl. ¶¶ 12-13, 29); (Exs. to Pl.'s Mots. for Summ. J., Ex. 6, at 2.)

The Defendant says that NATURE'S OWN and NATURE'S PRIDE are different marks.   It says that OWN and PRIDE are different words and that this difference is enough to distinguish the two marks.   This is consistent with the Patent and Trademark Office's practice of approving trademark registrations for similar products that include the word NATURE'S.   The Defendant also says that the brand

logos are also different.  The logo for NATURE'S PRIDE uses a different font and different colors and images than NATURE'S OWN.  (Simmons Decl. ¶¶ 25-28.)  The Defendant points to studies that showed that consumers would distinguish the brands based on the different logos.  (Id. ¶ 31.)

Looking solely at the evidence on the similarity of the marks, it appears that NATURE'S OWN and NATURE'S PRIDE are similar marks.  The similarities appear to outweigh the differences.  But it is not appropriate to decide this issue without also looking at the evidence on the strength of NATURE'S OWN as a trademark.  If the Defendant can show by evidence of third-party registrations that NATURE'S has "a normally understood and well-recognized descriptive or suggestive meaning," then the differences may be sufficient to distinguish the two marks.  2 McCarthy, supra, § 11:90, at 11-208; see also United Foods Inc. v. J.R. Simplot Co., 4 U.S.P.Q.2d 1172, 1174 (T.T.A.B. 1987) (holding that QUICK 'N CRISPY and QUICK 'N CHEESY are not similar marks because "[w]e find the respective marks involved herein to be extremely weak and highly suggestive and we conclude that the addition of the CRISPY suffix to applicant's mark is sufficient to distinguish it from any and all of opposer's marks").  And, if the Defendant can show by evidence of third-party uses that "customers have become so conditioned" to the word NATURE'S, then that is another reason why the differences may be sufficient to distinguish the two marks.

2 McCarthy, supra, § 11:88, at 11-199-200.  The Defendant's evidence, therefore, also shows that there are genuine issues of material fact as to the similarity of the two marks.

### 3.      Similarity of Products, Customers, and Advertising

The more similar the products, customers, and type of advertising, the more likely the marks will be confused.  See Ambrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1542 (11th Cir. 1986).  The Plaintiff says that the products, customers, and the type of advertising for NATURE'S OWN and NATURE'S PRIDE are identical.  The Defendant does not dispute this.  There are, therefore, no genuine issues of material fact as to the similarity of products, customers, and advertising.

### 4.      Defendant's Intent

"[A]n intent of the alleged infringer to gain through confusing customers or others is relevant to the issue of likelihood of confusion."  4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 23:110, at 23-349 (4th ed. 2010).  "The premise is that if defendant intended confusion, this tends to show confusion of customers in fact: 'the very act of the adopter has indicated that he expects confusion and resultant profit.'"  Id. § 23:110, at 23-349-50 (quoting Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 158 (9th Cir. 1963)).

The Plaintiff says that the Defendant chose the mark NATURE'S PRIDE because it wanted to gain from the good will associated with NATURE'S OWN. The Plaintiff points to statements from the Defendant that it wanted to "add [a] new brand or sub-brand that echoes the strength of Nature's Own" and that it wanted to "preempt Nature's Own in geographies and markets were [sic] they weren't." (Exs. to Pl.'s Mots. for Summ. J., Ex. 32, at 2) (emphasis omitted); (Carvara Dep. 57-58). The Plaintiff also points to research that the Defendant conducted before it launched NATURE'S PRIDE. The Plaintiff says that this research shows that the Defendant knew that there was a high risk of confusion between NATURE'S PRIDE and NATURE'S OWN. (Statement of Undisputed Material Facts in Supp. of Pl.'s Mot. for Partial Summ. J. as to Liability ¶¶ 230-40.)

The Defendant disagrees about the significance of its statements. It says those statements reflect a desire to legitimately compete with NATURE'S OWN, not to gain from its good will. See Gen. Mills, Inc. v. Kellogg Co., 824 F.2d 622, 627 (8th Cir. 1987) ("Knowledge of another's product and an intent to compete with that product is not, however, equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion."). The Defendant says that its conduct in developing the logo for NATURE'S PRIDE is proof of its good faith intent:

Throughout the packaging design process, IBC was clear in its desire for a packaging and trade dress concept that would stand out and be unique

> and readily distinguishable from its competitors in the bread category.
> Indeed, several "looks" which had been prepared for consideration were
> eliminated early on specifically because they were considered too similar
> to [NATURE'S OWN] look.

(Simmons Decl. ¶ 17.)  As to the research conducted before the launch of NATURE'S

PRIDE, the Defendant disagrees with the Plaintiff's interpretation of the results.

Among other things, the Defendant points to the fact that the author of one of the

research studies involving advertising for NATURE'S PRIDE concluded that

"[n]othing in the research . . . predicts that there would be market confusion between

'Nature's Pride' and 'Nature's Own.'" (Peine Decl. ¶ 23.)

The Defendant's evidence shows that there are genuine issues of material fact

as to the Defendant's intent.  The Plaintiff's evidence is not conclusive enough,

especially in light of the summary judgment principle that the Court should view the

evidence and any inferences that may be drawn in the light most favorable to the

nonmovant.

5.    Actual Confusion

Although it is not required, evidence of actual confusion is the best evidence

of a likelihood of confusion.  See World Carpets, Inc. v. Dick Littrel's New World

Carpets, 438 F.2d 482, 489 (5th Cir. 1971).  "There can be no more positive or

substantial proof of the likelihood of confusion than proof of actual confusion."  Id.

Evidence of actual confusion is "not limited to actual or potential purchasers, but also

includes others whose confusion threatens the trademark owner's commercial interest in its mark." Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 16 (1st Cir. 2004); see also Rolls-Royce Motors, 428 F. Supp. at 694 ("Such confusion need not always be that of a potential purchaser . . . .").

The Plaintiff's evidence falls into three categories.  First, the Plaintiff has presented evidence of purchaser confusion.  (Statement of Undisputed Material Facts in Supp. of Pl.'s Mot. for Partial Summ. J. as to Liability ¶¶ 167-240.)  This evidence shows actual or potential purchasers selecting NATURE'S PRIDE when they meant to select NATURE'S OWN; mistaking the Defendant's commercials for the Plaintiff's; making comments to the Plaintiff's representatives that suggest that they believe NATURE'S PRIDE is made by the Plaintiff; and mixing up coupons and promotions for NATURE'S PRIDE and NATURE'S OWN.  (Id.)  Second, the Plaintiff has presented evidence of retailer confusion.  (Id. ¶¶ 241-360).  This evidence shows retailers mixing up NATURE'S PRIDE and NATURE'S OWN in advertisements; contacting the Plaintiff to re-stock supplies of NATURE'S PRIDE; placing NATURE'S PRIDE shelf tags in front of NATURE'S OWN products; and mixing up NATURE'S PRIDE and NATURE'S OWN in receipts and other records. (Id.)  Third, the Plaintiff has presented evidence of competitor confusion.  (Id. ¶¶ 361-370).  This evidence shows representatives of other bread companies giving

NATURE'S PRIDE shelf tags to representatives of the Plaintiff during the shelf stocking process at grocery stores. (Id.)

The Defendant responds by raising a number of problems with the Plaintiff's evidence and by presenting its own evidence on actual confusion. The Defendant's arguments and evidence are sufficient to show that there are genuine issues of material fact. First, the Court has excluded from evidence a number of declarations that the Plaintiff relies on to show actual confusion. [Doc. 188] ("This Court grants the motion to exclude fact declarations of witnesses to the extent that those witnesses had not been identified by the close of discovery on [July 1, 2009].") (quotation marks omitted). Because the Court issued this ruling after the Plaintiff had moved for summary judgment, the record is somewhat unclear and is less substantial than the Plaintiff claimed in its brief.

Second, the Defendant says that the Plaintiff's evidence comes from biased sources. Few of the Plaintiff's declarations are from purchasers, competitors, or retailers. Instead, most are from the Plaintiff's employees or distributors. In their declarations, the Plaintiff's employees and distributors discuss interactions they had with purchasers, competitors, and retailers. The Defendant says that the Plaintiff "enlisted its employees and independent distributors (route delivery drivers) to gather evidence to support its legal claims." (Def.'s Mem. of Law in Opp'n to Pl.'s Three

Mots. for Partial Summ. J., at 12-13.)  It says that the Plaintiff's employees and distributors had an incentive or a bias towards inferring confusion, even if the people they were talking to were not actually confused.  This type of bias affects the weight of the Plaintiff's evidence and should be resolved by a fact-finder.  See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 298 (3d Cir. 2001) (holding that, during a bench trial, the district court "properly took into account the potential bias of [the plaintiff's] employees who testified they had been approached by consumers interested in [the defendant's] products"); A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 227 (3d Cir. 2000) (same).

Third, the Defendant says that many of the interactions with purchasers described by the Plaintiff's declarants are not credible or do not reflect confusion. Two purchasers said that they selected NATURE'S PRIDE when they meant to select NATURE'S OWN, but the Defendant says that is not possible.  The Defendant says that, at the time of the alleged confusion, it did not sell NATURE'S PRIDE in the areas where those two purchasers live.  (Def.'s Mem. of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 25.)  Another purchaser called the Plaintiff to ask about the Plaintiff's multi-grain bread.  The Plaintiff says that this shows confusion because the Plaintiff does not make a multi-grain bread.  But the Defendant says that the Plaintiff does make multi-grain breads and that this is another example of how the

Plaintiff's employees and distributors had a bias or incentive towards inferring confusion.  (Id. at 26.)  Another purchaser submitted comments to the Plaintiff's website about her purchase of NATURE'S PRIDE.  The Plaintiff says that this shows the purchaser was confused.  But the Defendant says that the purchaser may have been careless about looking up NATURE'S PRIDE on the internet, not confused about the brands.  See Checkpoint Sys., 269 F.3d at 298 ("[M]isdirected communications are not evidence of confusion where the sender knows which party he or she wished to send his communication but erred in the delivery of the message.").  The Defendant raises similar arguments about other interactions with purchasers described by the Plaintiff's declarants.  These arguments should be resolved by a fact-finder.

Fourth, the Defendant says that the interactions with retailers and competitors described by the Plaintiff's declarants reflect carelessness, not confusion.  Most of these interactions involved store-level employees contacting the Plaintiff about re-stocking.  The employees would say that the Plaintiff needed to re-stock NATURE'S OWN, but the Plaintiff's representatives would later realize that it was NATURE'S PRIDE that needed to be re-stocked.  The Plaintiff says that this shows that the employees were confused about the two brands.  But the Defendant says that these mistakes reflect carelessness.  See 4 McCarthy, supra, § 23:13, at 23-102.13 ("[T]he courts have sometimes characterized evidence of actual confusion as mere secretarial

carelessness caused by a failure to check business addresses, or due merely to

inattention and indifference, or that misdirected mail and phone calls are caused by

mere carelessness of the post office or persons looking in the phone directory.")

(quotation marks omitted).  One of the Defendant's former employees explains that

"because the receiving clerks, administrative assistants, store managers, and other

personnel making these errors are attempting to their jobs quickly and are often under

a lot of pressure, they sometimes make these sorts of mistakes." (McDaniel Decl. ¶

25.)  He says, as a result, these types of mistakes happen regardless of the brand

names:

> 23.  In my experience, mistakes such as this one by managers, receiving clerks, or other retail store personnel are not uncommon.
> 24.  I (and members of [the Defendant's] route sales force with whom I worked) routinely received phone calls from various supermarket personnel informing me that my section on the grocery store shelf was empty.  It was only when I dispatched a . . . representative to restock the shelf, or went to check the shelf myself, that I discovered that the empty section belonged to another bread manufacturer, such as Pepperidge Farm.  I was receiving these phone calls well before the launch of Nature's Pride in February 2009.

(Id. ¶¶ 23-24); (see also id. ¶¶ 18-20.)  Whether these interactions reflect carelessness

or confusion is another issue that should be resolved by a fact-finder.

Fifth, the Defendant says that the number of instances of actual confusion is not

significant when compared to the number of opportunities for confusion.  "Evidence

of the number of instances of actual confusion must be placed against the background

of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence."  4 McCarthy, supra, § 23:14, at 23-102.17; see also Amstar, 615 F.2d at 258.  For all of the reasons so far discussed, the Defendant says that the number of instances of actual confusion is small.  How small depends on how a fact-finder resolves some of the disputed issues regarding the Plaintiff's evidence.  By contrast, the Defendant says that the number of opportunities for confusion was very large:

> To put [the Plaintiff's] alleged confusion evidence into proper context, during the relevant twenty-week period, [the Plaintiff] sold more than 37 million loaves of Nature's Own bread.  (Seban Decl. ¶ 80.)  In addition, as soon as Nature's Pride was on the market, [the Plaintiff] enlisted its employees to gather evidence for its already-pending lawsuit.  (Kirbo Decl. ¶¶ 6-7.)  During the relevant period, [the Plaintiff's] 3,600 "independent" distributors made approximately 3.6 million visits to retail store bread aisles (Plevan Decl. ¶ 12), and [the Plaintiff's] 100-plus sales management employees approximately 240,000 visits.

(Def.'s Mem. of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 30.)

Sixth, the Defendant has presented evidence of consumer surveys and analysis of market sales that show that there is not a likelihood of confusion.  Philip Johnson, the Defendant's survey expert, has conducted two consumer surveys that show no meaningful levels of confusion.  (Pl.'s Mot. to Exclude Survey and Expert Report of

Philip Johnson, Ex. A, at 28.)[2]  And Bruce Seaman, the Defendant's damages expert, has analyzed market research regarding sales of NATURE'S OWN and NATURE'S PRIDE.  His research shows that "if alleged trademark confusion had been a material factor in Nature's Pride sales, Nature's Pride would have had a greater impact on Nature's Own sales than on sales of other brands, yet Nature's Pride actually had a greater impact on other products, such as Sara Lee and Wonder."  (Def.'s Mem. of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 32); see also (Exs. to Pl.'s Mots. for Summ. J., Ex. 186, ¶ 20).  Although survey evidence is not considered strong evidence, "[i]n borderline cases where evidence of confusion is not available or is not persuasive, the gap can sometimes be filled by a properly conducted survey . . . ."  4 McCarthy, supra, § 23:17, at 23-104.

6.  Summary of the Confusion Factors

Of the seven factors, only three of the factors–similarity of products, similarity of customers, and similarity of advertising–clearly support the Plaintiff.  The other four factors–strength of mark, similarity of marks, defendant's intent, and actual confusion–should not be resolved on summary judgment because they involve

---

[2]The Plaintiff has moved to exclude testimony from Johnson as inadmissible under Rule 702 of the Federal Rules of Evidence. [Doc. 144].  The Court has not yet decided that motion.  But, even if the Court ends up granting the motion, the Plaintiff still would not be entitled to summary judgment as to the Defendant's liability.

genuine issues of material fact.  The strength of mark factor by itself is sufficient to deny summary judgment because, if NATURE'S OWN is a descriptive mark, then the Plaintiff must show that it has acquired secondary meaning in order to prove that it is entitled to any protection as a trademark.  Therefore, the Plaintiff is not entitled to summary judgment as to the liability for any of its claims.

> B.   Affirmative Defenses

If the Plaintiff can establish liability, the Defendant may be able to rely on certain defenses that avoid liability.  The Plaintiff moves for summary judgment as to these affirmative defenses.  In its answer, the Defendant asserted the affirmative defenses of laches, estoppel, waiver, and acquiescence.  (Def.'s Answer to Pl.'s Second Supplemental Compl. and Supplemental Counterclaim, at 16.)  With the benefit of discovery, the Defendant has withdrawn all but the defense of waiver. (Def.'s Mem. of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 59.)

There is an initial issue of whether waiver is even available in this action. Because the Plaintiff's trademark rights are incontestable, the Defendant may only assert certain enumerated defenses.  See 15 U.S.C. § 1115(b) ("Such conclusive evidence of the right to use the registered mark . . . shall be subject to the following defenses or defects . . . .").  Waiver is not listed as an available defense.  "[E]quitable principles, including laches, estoppel, and acquiescence," however, are listed as

permissible defenses.  15 U.S.C. § 1115(b)(9).  The Defendant says that equitable

principles include waiver.  See Novell, Inc. v. Weird Stuff, Inc., No. C92-20467

JW/EAI, 0094 WL 16458729, at *12 (N.D. Cal. Aug. 2, 1993) ("Waiver is a

recognized defense to trademark infringement."); cf. McGinty v. United States Dep't

of the Army, 900 F.2d 1114, 1118 (7th Cir. 1990) ("If the administrative deadlines are

treated like statutes of limitations then equitable principles such as waiver, estoppel,

and tolling, are applicable . . . .").  The Plaintiff disagrees.  See SunAmerica Corp. v.

SunLife Assurance Co. of Can., 77 F.3d 1325, 1344 n.7 (11th Cir. 2010) ("The district

court's invocation of 'waiver' has no trademark roots.");[3] Pandora Jewelers 1995, Inc.

v. Pandora Jewelry, LLC, No. 09-61490-CIV, 2010 WL 1029247, at *8 n.7 (S.D. Fla.

Mar. 18, 2010) ("Since, the waiver defense has no root in trademark law, I will not

address that defense in this order.").  Because it will not ultimately affect the outcome,

the Court will assume that the defense of waiver is available in this action.

"Waiver is the intentional relinquishment of a known right with knowledge of

its existence and the intent to relinquish it."  United States v. King Features Entm't,

843 F.2d 394, 399 (9th Cir. 1988).  "[T]he evidence must so clearly indicate an intent

to relinquish a known right as to exclude any other reasonable explanation."  Allstate

---

[3]Although the Plaintiff says that this statement–"'waiver' has no trademark
roots"–is a holding, the Court is not so sure.  SunAmerica, 77 F.3d at 1344 n.7.  The
statement appears to be dictum.

Fin. Corp. v. Dundee Mills, Inc., 800 F.2d 1073, 1075 (11th Cir. 1986).  "Waiver is more difficult to prove than either laches or acquiescence, as it involves not sleeping on one's rights but intentionally relinquishing them."   RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC, 655 F. Supp. 2d 679, 711 n.12 (S.D. Tex. 2009).

The Defendant says that the Plaintiff waived its trademark rights because the Plaintiff did not contest a number of federal trademark registrations for bread and related products that use the word NATURE'S in the mark.  Those trademarks include NATURE'S PATH (March 2004), NATURE'S PROMISE (May 2006), NATURE'S CUPBOARD (June 1985), NATURE'S RECIPE (January 1984), NATURE'S ESTATE (May 2007), and NATURE'S WHEAT (December 1981).  Def.'s Mem. of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 62.)

But these registrations are not evidence of waiver.  "[The] equitable defenses listed in subsection [(b)(9)] are personal defenses, based upon the trademark owner's conduct vis-a-vis the defendant . . . ."  Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1079 n.11 (5th Cir. 1997).  The Defendant, therefore, cannot prove that the Plaintiff waived its trademark rights in this action by relying on the Plaintiff's conduct towards other companies.  See Sweetheart Plastics, Inc. v. Detroit Forming, Inc., 743 F.2d 1039, 1046 (4th Cir. 1984) ("[T]hat Sweetheart may have delayed in enjoining other manufacturers from using the dish designs would not amount to an assurance to

Detroit that Sweetheart would not assert its trademark rights against Detroit.");
Paramount Pictures Corp. v. Carol Publ'g Group, 11 F. Supp. 2d 329, 338 (S.D.N.Y. 1998) ("The mere fact that [d]efendants heard from third parties that no one had complained about their arguable infringing products does not in any way estop [p]laintiffs from enforcing their rights against [d]efendants."); Libbey Glass, Inc. v. Oneida Ltd., 61 F. Supp. 2d 700, 719 (N.D. Ohio 1999) ("Libbey's alleged delay in prosecuting other infringers has no relevance to . . . estoppel/waiver.").

The Plaintiff's conduct towards other companies is relevant only to a defense of abandonment, which the Defendant has not asserted. See 15 U.S.C. § 1115(b)(2). Even then, the Plaintiff's failure to object to similar trademark registrations would only establish abandonment if the "mark has lost all significance as an indication of origin." Sweetheart Plastics, 743 F.2d at 1047; see also Exxon, 109 F.3d at 1080; Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp., 680 F.2d 755, 766 (C.C.P.A. 1982). Because the Defendant has not presented relevant evidence of waiver and has withdrawn its other defenses, the Plaintiff is entitled to summary judgment as to the Defendant's affirmative defenses.

C.    Recovery of Defendant's Profits

If the Plaintiff can establish liability, it may be entitled to recovery of the Defendant's profits. "[T]he plaintiff shall be entitled, subject to the provisions of

sections 29 and 32 [15 U.S.C. §§ 1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  As to the amount of profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  Id.  Although it has not yet established either liability or that it is entitled to recovery of the Defendant's profits, the Plaintiff moves for summary judgment as to the recovery of the Defendant's profits.

To satisfy its burden, a "plaintiff need only prove gross sales."  5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 30:66, at 30-164 (4th ed. 1996).  The Plaintiff relies on the Defendant's evidence to show gross sales.  From the introduction of NATURE'S PRIDE on February 9, 2009 to the end of the fact discovery period on July 1, 2009, the Defendant's gross sales were $34,813,522. (Seban Decl., Ex. B, at 1.)  This amount is not in dispute.

Once a plaintiff establishes gross sales, "it is then the infringer's burden to prove (1) which, if any, of those sales were not attributable to the wrongful act, and (2) deductible costs and expenses to arrive at net profits."  5 McCarthy, supra, § 30:66, at 30-164.  The Defendant asserts both types of deductions.

1.     Unrelated Sales

If a defendant shows that its sales were unrelated to the infringement, then the plaintiff is not entitled to recovery of those profits.  See Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 206 (1942) ("The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark."); Gold Kist, Inc. v. ConAgra, Inc., 708 F. Supp. 1291, 1304 (N.D. Ga. 1989) ("Profits to be recovered must come from sales made by defendants to purchasers who sought to buy plaintiff's products and instead bought defendant's products.").

The Defendant says that alleged confusion between NATURE'S PRIDE and NATURE'S OWN had little or nothing to do with its sales.  It points to evidence from Bruce Seaman, its damages expert.  Seaman has analyzed market research regarding sales of NATURE'S OWN and NATURE'S PRIDE.  His research shows that "if alleged trademark confusion had been a material factor in Nature's Pride sales, Nature's Pride would have had a greater impact on Nature's Own sales than on sales of other brands, yet Nature's Pride actually had a greater impact on other products, such as Sara Lee and Wonder."  (Def.'s Mem. of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 32); see also (Exs. to Pl.'s Mots. for Summ. J., Ex. 186, ¶ 20). The Defendant also points to evidence that "70% of [its] sales of Nature's Pride had occurred in states where [the Plaintiff] did not sell Nature's Own."  (Seban Decl. ¶ 43.)  In those states, the Defendant says that customers could not have intended to buy

NATURE'S OWN.   The Plaintiff's only response seems to be that it is the Defendant's burden to show unrelated sales.  But the Defendant has met its burden. It has presented evidence from which a fact-finder could conclude that alleged confusion between NATURE'S PRIDE and NATURE'S OWN had little or nothing to do with its sales.

        2.    <u>Deductible Costs</u>

If a defendant can show the costs required to make its sales, then it may deduct those costs from its gross sales.  A defendant must support an assertion of costs with corroborating documents.  <u>See</u> <u>Maltina Corp. v. Cawy Bottling Co., Inc.</u>, 613 F.2d 582, 586 (5th Cir. 1980) ("[The defendant] failed, however, to submit any of this corroboration to the district court."); <u>Bambu Sales, Inc. v. Ozak Trading Inc.</u>, 58 F.3d 849, 854 (2d Cir. 1995) ("The district court . . . acted well within its discretion . . . in refusing to deduct expenses that were not proven by documentary evidence."); <u>Contemporary Rest. Concepts, Ltd. v. Las Tapas-Jacksonville, Inc.</u>, 19 U.S.P.Q.2d 1411, 1417 (M.D. Fla. 1991) ("[The defendant] did not carry his burden of proof due to his failure to produce a single item of evidence corroborating these deductions."). Simply summarizing costs is not enough.  <u>See</u> <u>Maltina</u>, 613 F.2d at 587 (rejecting as insufficient a table with costs summarized); <u>H-D Mich., Inc. v. Bikers Dream, Inc.</u>, No. CV 97-864 SVW, 1998 U.S. Dist. LEXIS 17259, at *21 (C.D. Cal. July 28, 1998)

("Outside of a single number placed on the summary, there is no evidence that [the defendant] incurred any labor costs in conducting its infringing activity.").

A defendant must also only assert costs that are "'actually related' to the sale of the infringing product." Nike Inc. v. Variety Wholesalers, Inc., 274 F. Supp. 2d 1352, 1373 (S.D. Ga. 2003). This usually means that a defendant must assert "variable" costs that are only incurred because of the infringing product. See Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931, 941 (7th Cir. 1989); JTH Tax, Inc. v. H&R Block E. Tax Servs., Inc., 245 F. Supp. 2d 749, 751 (E.D. Va. 2002). But a defendant may be able to assert a proportion of "fixed" costs (such as overhead), if the defendant can show that the infringing product "actually increased overhead expenses" and that the sales of the infringing product were more than "a small percentage of total sales." Maltina, 613 F.2d at 586.

The Defendant asserts three types of deductible costs. First, it asserts standard costs, which "refers to the cost of ingredients, packaging, labor, and overhead required to produce Nature's Pride products." (Exs. to Pl.'s Mots. for Summ. J., Ex. 186, ¶ 24.) It says its standard costs were $16,865,678. (Id.) To support its assertion, the Defendant submitted a table identifying its net revenue, gross margin, marketing expenses, and route expenses. (Seban Decl., Ex. A, at 1.) The Defendant also submitted an expert report from Bruce Seaman and a declaration from Richard Seban,

its chief marketing officer.  (Exs. to Pl.'s Mots. for Summ. J., Ex. 186); (Seban Decl.)
Standard Costs is a term used internally at IBC to refer to the cost of ingredients,
packaging, labor, and plant overhead.  Standard Costs are calculated and reported by
IBC's bakery accounting managers at actual, current cost, and are loaded in the Sales
Data Warehouse by the bakery accounting managers.  The Standard Costs used to
determine NATURE'S PRIDE Gross Margin in Exhibit A were taken directly from
the Sales Data Warehouse as of May 30, 2009.  (Seban Decl. ¶ 22.)  This evidence,
while thin, is enough to create a genuine issue of fact.

Second, the Defendant asserts marketing expenses, which refers to "expenses
incurred in marketing, advertising, and promoting the Nature's Pride brand and
Nature's Pride products."  (Exs. to Pl.'s Mots. for Summ. J., Ex. 186, ¶ 24.)  It says
its marketing expenses were $13,822,853.  (Id.)  To support its assertion, the
Defendant has submitted individual invoices it paid for marketing, promotion, and
advertising of NATURE'S PRIDE.  (Seban Decl., Ex. C); (Exs. in Supp. of Def.'s
Opp'n to Pl.'s Mots. for Partial Summ. J., Ex. 176.)  This is appropriate evidence to
support the Defendant's assertion of marketing expenses.  The invoices corroborate
the Defendant's assertion.  The Plaintiff says that a significant number of the invoices
indicate that they are "prepaid and amortized."  The Plaintiff, therefore, says that the
Defendant has not proven that all of its marketing expenses were actually used to

achieve its gross sales from February 2009 to July 2009.  But this is the type of inference that should be resolved by a fact-finder, not by the Court on a motion for summary judgment.

### 3.   Deductions for Sales After July 1, 2009

The Plaintiff says that the Defendant continues to sell NATURE'S PRIDE but has not supplemented any of its discovery responses to cover sales following July 1, 2009.  It says that the Defendant, therefore, does not have any evidence to support deductions for sales after July 1, 2009.  In response, the Defendant says that the damages period for purposes of summary judgment is February 9, 2009 to July 1, 2009.  It says that the Plaintiff is essentially "arguing that the period for evidence of alleged damages continues on indefinitely at its option, even though its damages expert report was due, and was served, on July 2, 2009."  (Def.'s Mem.  of Law in Opp'n to Pl.'s Three Mots. for Partial Summ. J., at 58.)

The Court agrees with the Defendant.  For purposes of summary judgment, the proper damages period is February 9, 2009 to July 1, 2009.  At some point, the Defendant may need to supplement its discovery responses to include evidence of deductions for sales after July 1, 2009.  But, for now, these summary judgment motions will be judged on the basis of sales from February 9, 2009 to July 1, 2009.

IV.  <u>Conclusion</u>

For the reasons set forth above, the Court DENIES the Plaintiff's Motion for Partial Summary Judgment as to Liability Issues [Doc. 120]; the Court GRANTS the Plaintiff's Motion for Partial Summary Judgment as to the Defendant's Affirmative Defenses [Doc. 119]; and the Court DENIES the Plaintiff's Motion for Partial Summary Judgment as to an Accounting of Defendant's Profits [Doc. 121].

SO ORDERED, this 30 day of June, 2010.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge