IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FLOWERS BAKERIES BRANDS,
INC.,

    Plaintiff,

      v.

INTERSTATE BAKERIES
CORPORATION,

    Defendant.

CIVIL ACTION FILE
NO. 1:08-CV-2376-TWT

## ORDER

This is a trademark infringement action.  It is before the Court on the Plaintiff's

motions to exclude testimony from the Defendant's expert witnesses.  For the reasons

set forth below, the Court GRANTS IN PART and DENIES IN PART the Motion to

Exclude Expert Witness Report of Beth A. Chapman [Doc. 124]; DENIES the Motion

to Exclude Expert Witness Report and Testimony of Reshma Shah [Doc. 142]; and

DENIES the Motion to Exclude Survey and Expert Report of Philip Johnson [Doc.

144].

## I.  Background

Flowers Bakeries Brands, Inc. sells bread and other baked goods under the

brand name NATURE'S OWN.  Flowers has three different federal trademark

registrations for the NATURE'S OWN mark, and has been selling baked goods under that brand name since 1976.  In 2008, Interstate Bakeries Corporation developed a new line of baked goods products to be sold under the brand name NATURE'S PRIDE.  In July 2008, before NATURE'S PRIDE was launched, Flowers filed this trademark infringement action against Interstate Bakeries Corporation.   In its complaint, the Plaintiff asserts federal law claims for trademark infringement and unfair competition and state law claims for trademark dilution, unfair competition, and deceptive trade practices. [Doc. 21-2].

Notwithstanding the lawsuit, the Defendant proceeded with its launch of NATURE'S PRIDE line of baked goods.  By February 2009, the Defendant was selling and advertising NATURE'S PRIDE throughout most of the United States. Meanwhile, this litigation continued, and the parties engaged in discovery and other pre-trial matters.  The Plaintiff has filed several motions to exclude testimony from the Defendant's expert witnesses, which are now before the Court.  The Plaintiff says that the testimony of Beth A. Chapman, Reshma Shah, and Philip Johnson does not meet the requirements for admissible expert testimony under Rule 702 of the Federal Rules of Evidence.

## II.  Legal Standard

Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience, training,
> or education, may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based on sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and (3) the witness has
> applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589

(1993).  The reason for these requirements is to ensure that an expert "employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field."   Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152

(1999).  The party offering testimony from an expert must show by a preponderance

of evidence that the testimony is admissible.  Allison v. McGhan Med. Corp., 184

F.3d 1300, 1306 (11th Cir. 1999).

## III.  Discussion

### A.      Beth Chapman

The Defendant offers the testimony of Beth A. Chapman as an expert in Patent

and Trademark Office (PTO) policy and procedure.  Chapman worked at the PTO for

more than thirty years, from 1973 to 2005.  She started as a trademark examining

attorney, then became an interlocutory attorney before the Trademark Trial and

Appeal Board (TTAB), and finished as an administrative law judge for the TTAB. Her testimony includes three expert opinions about PTO policy and procedure. The Court will analyze each of these opinions separately.

First, Chapman provides an expert opinion about the strength of the NATURE'S OWN trademark. She says that, "[i]n my opinion the terms NATURE'S and NATURE are . . . weak in the food and beverage industry and purchasers will look to the other elements in the marks to distinguish the source of the goods." (Pl.'s Mot. to Strike Expert Witness Report of Beth A. Chapman and Supporting Brief, Ex. A ¶ 33.) She bases this opinion on her review of third party registrations of similar trademarks. Her review showed that the PTO has, "for decades, registered many two-word marks consisting of NATURE'S/NATURE and a second word, for bakery products and/or other food/beverage products." (Id.) Third party registrations can prove that "some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that the segment is relatively weak." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:90, at 11-208 (4th ed. 1996); see also (Pl.'s Mot. to Strike Expert Witness Report of Beth A. Chapman and Supporting Brief, Ex. A, ¶ 17.) Chapman's review of third party registrations provides sufficient support for her expert opinion.

The Plaintiff objects to the fact that Chapman relies on third party registrations. It says that third party registrations are irrelevant without evidence of how the marks are actually being used and that Chapman never researched actual use.  But the Plaintiff ignores the difference between third party registrations and third party uses. It may be true that "[t]he mere citation of third party <u>registrations</u> is not proof of third party <u>uses</u> for the purpose of showing a crowded field and relative weakness."  2 McCarthy, <u>supra</u>, § 11:89, at 11-204; <u>see also</u> <u>Turner v. H M H Pub. Co.</u>, 380 F.2d 224, 228 n.2 (5th Cir. 1967).  But "a real evidentiary value of third party registrations per se is to show the sense in which a term, word, prefix or suffix of a mark is used in ordinary parlance.  That is, third party registrations are similar to dictionaries showing how language is generally employed."  2 McCarthy, <u>supra</u>, § 11:90, at 11-208; <u>see also</u> <u>Institut Nat'l Des Appellations D'Origine v. Vinters Int'l Co., Inc.</u>, 958 F.2d 1574, 1582 (Fed. Cir. 1992); <u>Spraying Sys. Co. v. Delavan, Inc.</u>, 762 F. Supp. 772, 778 (N.D. Ill. 1991). Her testimony on this issue is admissible under Rule 702.

Second, Chapman provides an expert opinion about the procedure for opposition and cancellation proceedings at the PTO.  (Pl.'s Mot. to Strike Expert Witness Report of Beth A. Chapman and Supporting Brief, Ex. A ¶¶ 33-43.)  The Defendant offers this testimony to respond to the Plaintiff's argument that the Plaintiff "has aggressively challenged the use and registration of marks that begin with the

words 'NATURE'S' and 'NATURE' and that cover baked goods." (Kirbo Third Decl. ¶ 33.) The Defendant says that Chapman's explanation of PTO procedure will help a trier of fact properly evaluate whether the Plaintiff "has aggressively challenged" the use and registration of similar marks. PTO procedure is complex and involves specialized expertise. Courts have allowed expert testimony to explain PTO procedure. See Bausch & Lomb, Inc. v. Alcon Labs., Inc., 79 F. Supp. 2d 252, 256 (W.D.N.Y. 2000) ("PTO procedures are foreign to the average person, and it may be helpful to the jury to hear someone experienced in those procedures explain how they operate in terms that a layperson can understand."). Because of her experience at the PTO, Chapman is clearly qualified to provide an expert opinion about PTO procedure for opposition and cancellation proceedings.

The Plaintiff says that the Defendant does not need expert testimony to explain the procedure for opposition and cancellation proceedings at the PTO. It says that "[n]ot only are [the PTO] databases easily searchable even by trademark laity, information in them can be introduced by the submission of a certified . . . copy of the file-wrapper history of any registration at issue." (Reply Br. in Supp. of Pl.'s Mot. to Exclude Expert Witness Report of Beth A. Chapman, at 14.) But just because the Defendant may be able to explain an issue with other evidence does not mean that expert testimony is inadmissible. The standard is not necessity. The standard is

whether "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Here, Chapman's specialized knowledge about PTO procedure will help the trier of fact better understand whether the Plaintiff "has aggressively challenged" the use and registration of similar marks. Her testimony on this issue is admissible under Rule 702.

Third, Chapman provides an expert opinion about whether the examining attorneys followed correct PTO policy and procedure.  She says that, "[i]n my opinion, in allowing [marks that begin with the words 'NATURE'S' and 'NATURE'], the examining attorneys acted in accordance with USPTO policy and procedure under the Trademark Act."  (Pl.'s Mot. to Strike Expert Witness Report of Beth A. Chapman and Supporting Brief, Ex. A ¶ 32.)  One step that examining attorneys must conduct before allowing registration of a mark is to "conduct a search of USPTO records to determine whether the applicant's mark so resembles any registered mark(s) as to be likely to cause confusion or mistake."   United Patent and Trademark Office, Trademark Manual of Examining Procedure, § 1207.01 (2010), available at http://tess2.uspto.gov/tmdb/tmep/1200.htm#_T120701. But, when asked about these searches, Chapman revealed that she had assumed that the examining attorneys properly conducted these searches.  She was not actually able to see for herself whether they had done so.  As she said in her deposition:

Q.  Are you opining as part of your report or as part of your testimony that the examiner used the proper search methodology?
A.  Again, I'm going on – I have no reason to assume they did not.
Q.  Okay.
A.  And what they viewed and the decision they made, I have no reason to assume they did not follow proper examination procedure, proper search procedure.
Q.  But you're assuming that as opposed to identifying something in the file wrappers that tells you what they did; is that correct?
A.  That's correct, because I cannot identify by registration number what they looked at.

(Chapman Depo. at 158-59.)

Because she does not know whether the examining attorneys properly conducted searches, Chapman's expert opinion about whether they followed correct PTO policy and procedure is unreliable.  See Tyger Constr. Co., Inc. v. Pensacola Constr. Co., 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.").  It is also not clear why this opinion is even relevant to this action. The substantive reasons why the registrations were allowed are relevant, but the mere fact that the examining attorneys followed correct PTO policy and procedure is not. Chapman's testimony on this issue is inadmissible under Rule 702.

B.     Reshma Shah

The Defendant offers the testimony of Reshma Shah as an expert in marketing. Shah has a Ph.D. in marketing from the University of Pittsburgh, an M.B.A. from the University of Southern California, and a B.S. in business administration from the University of Illinois, Champaign-Urbana. She is currently an assistant professor of marketing at Emory University and a partner at Inflexion Point Marketing Group, which focuses on brand strategy. Her testimony focuses on her expert opinion that, "from a marketing perspective, there are numerous and significant differences between Nature's Pride and Nature's Own in the key branding elements, and . . . that consumers are not likely to be confused between the respective brands based on an analysis of marketing issues." (Pl.'s Mot. to Exclude Expert Witness Report and Testimony of Reshma Shah, Ex. A, at 2.)

Shah's expert report begins by discussing general principles of brand strategy. She emphasizes that "[a] consumer's brand experience consists of the sum of all points of contact with the brand." (Id., at 4.) These points of contact include the brand name, logo, packaging, product presentation, website, and advertising. She then applies those general principles to NATURE'S OWN and NATURE'S PRIDE. She discusses the similarities and differences between the two marks as it relates to each point of contact. She concludes by stating that, based on a marketing analysis of the two brands, consumers are not likely to be confused.

Shah's testimony is admissible under Rule 702.   After reviewing her expert report, her deposition testimony, and the parties' briefs, the Court concludes that Shah has sufficient support for her expert opinions and that her testimony will assist the trier of fact in deciding whether there is a likelihood of confusion.  See Smith v. Ames Dep't Stores, Inc., 988 F. Supp. 827, 834 (D.N.J. 1997) (noting that "non-survey expert testimony" is appropriate in some trademark actions).

The Plaintiff has a number of objections to Shah's testimony.  The Plaintiff says that Shah's testimony is "completely generic, in that Dr. Shah does not really apply the considerations to the record in this case."  (Pl.'s Mot. to Exclude Expert Witness Report and Testimony of Reshma Shah, at 3.)  But Shah does apply general marketing principles to the specific facts in this action.   Her expert report discusses the similarities and differences between NATURE'S OWN and NATURE'S PRIDE as it relates to brand name, logo, packaging, product presentation, website design, and advertising.  For example, as to logo, Shah explained that:

> Logos are distinguished on a number of elements.  Salient attributes include color, font, style, icons and imagery.  The Nature's Pride color schema of blue and metallic gold, its solid white font with all same sized, upper case letter, its format, symmetric two-level word positioning and the wheat, belt, ribbon and banner all result in a logo design that is distinctly different from that of Nature's Own.  The Nature's Own logo, in contrast, has an orange, non metallic gold, and brown color scheme and uses an outline shape of the letters in the brand line in a scripted font with upper and lower case lettering.  These differences help to convey

the differences in brand intent between Nature's Pride and Nature's Own.

. . . .

The distinction in the brand intent, or what the marketers plan for the brand to mean in the mind of the consumer, is emphasized by IBC's decision to choose the logo/packaging that supported the wide pan findings vs. the everyday wheat findings. . . . That Interstate Bakeries strategically chose to implement the blue oval suggests their commitment to the distinct positioning for Nature's Pride.

(Pl.'s Mot. to Exclude Expert Witness Report and Testimony of Reshma Shah, Ex. A, at 9.)  Shah makes similar comparisons for each of the other "points of contact."  Her testimony is not "completely generic."

The Plaintiff also says that Shah does not support her opinions with direct evidence from consumers.  For example, the Plaintiff says that, even if Shah can identify differences between the NATURE'S PRIDE logo and the NATURE'S OWN logo, she does not have any evidence that consumers have perceived those same differences.  But the Plaintiff does not identify any reason why Shah must have direct evidence from consumers.  The Plaintiff does not say that Shah has violated or ignored any marketing principle or that marketing analysis as a whole is an unreliable way of predicting consumer behavior.  While it would make her testimony stronger and more persuasive if she did have direct evidence from consumers, the absence of such evidence does not make her testimony inadmissible.  Cf. 4 McCarthy, supra, § 23:63, at 23-260 ("[T]here is no specific event or action to be proved by direct evidence; the

likelihood that purchasers will be confused must ultimately rest on the inference to be

drawn from circumstantial evidence."); Badger Meter, Inc. v. Grinnell Corp., 13 F.3d

1145, 1153 (7th Cir. 1994) ("[The defendant] argues strenuously that [the plaintiff's]

failure to introduce any market survey evidence of likely consumer confusion militates

against finding such a likelihood; once again, however, this goes to the weight and not

to the sufficiency of the evidence.").

The Plaintiff next says that Shah failed to apply the Eleventh Circuit's seven-

factor test for likelihood of confusion. See Frehling Enters., Inc. v. Int'l Select Group,

Inc., 192 F.3d 1330, 1335 (11th Cir. 1999). Shah admits that she did not consider at

least two of the factors: defendant's intent and actual confusion. But the Plaintiff does

not identify any reason why Shah must apply the seven-factor test. The seven-factor

test is a standard for liability. It is not a standard for the admissibility of evidence.

Shah's testimony will assist the trier of fact to understand many of the seven factors,

primarily the similarity of marks. For the factors that Shah does not consider, the trier

of fact can look to other evidence and decide what weight to give Shah's testimony

in light of that evidence.

Lastly, the Plaintiff says that Shah relies on third party uses of similar

trademarks but did not consider the extent of those third party uses. See 2 McCarthy,

supra, § 11:88, at 11-203 ("To present a more compelling case, defendant should go

further to show how extensive these uses are and how long they have continued.")
But Shah did consider the extent of third party uses.  Her expert report states that "the
large number of brands with [nature, nature's, or natural] emphasizes the ubiquitous
and everyday status of the word 'nature.'"  (Pl.'s Mot. to Exclude Expert Witness
Report and Testimony of Reshma Shah, Ex. A, at 6) (emphasis added).   Shah
researched third party uses by looking at an Information Resources Inc. list given to
her by the Defendant.  (Shah Depo at 104-05.)  This list included some information
about sales numbers.  (Id.)  Shah also visited grocery stores and did internet searches
to confirm the brands were still being used.  (Id. at 113.)  This is sufficient support for
her expert opinions.

       C.     <u>Philip Johnson</u>

The Defendant offers the testimony of Philip Johnson as an expert in consumer
surveys.  Johnson has a B.S. in psychology from Loyola University and an M.B.A.
from the University of Chicago.  He is the chief executive officer of Leo J. Shapiro
and Associates, a market research and consulting firm that conducts surveys.  He has
conducted hundreds of consumer surveys and has been retained as an expert witness
in many trademark infringement actions.  (Pls.' Mot. to Exclude Survey and Expert
Report of Philip Johnson, Ex. A ¶ 2.)

Johnson designed and supervised two independent surveys to test the likelihood of confusion between NATURE'S OWN and NATURE'S PRIDE. The first survey was an Eveready survey. It is called an Eveready survey because it is similar to the survey presented in Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 385 (7th Cir. 1976). This survey tries to "simulate[] what happens when a consumer who has been exposed to Nature's Own in the marketplace encounters Nature's Pride." (Pls.' Mot. to Exclude Survey and Expert Report of Philip Johnson, Ex. A ¶ 5.) An independent firm conducted interviews at shopping malls in Dallas, Texas; Houston, Texas; Los Angeles, California; San Antonio, Texas; and San Diego, California. There was a test cell and a control cell; each had 200 subjects. In the test cell, each subject was shown a photograph of NATURE'S PRIDE 100% Natural Whole Grain bread. In the control cell, each subject was shown a photograph of Natural Ovens Whole Grain bread.[1] After seeing the photograph, the subject was asked if he or she knew who made the bread and whether that company made any other brands.

The results of the Eveready survey showed that "there is no likelihood of confusion . . . between Nature's Own and Nature's Pride." (Id., Ex. A ¶ 31.) 2% of

_____

[1]Johnson used Natural Ovens as a control "because the name contains two words, uses a variation of the word 'natures,' and [the Plaintiff] does not consider it to be an infringing mark." (Pls.' Mot. to Exclude Survey and Expert Report of Philip Johnson, Ex. A ¶ 6.)

the test cell said that the company who made the bread was NATURE'S OWN.  No one said NATURE'S OWN in response to the question about whether that company made any other brands.  1% of the control cell said that the company who made the bread was NATURE'S OWN.  1% of the control cell said NATURE'S OWN in response to the question about whether that company made any other brands.  To arrive at "net confusion," Johnson subtracted the "proportion of consumers in the control cell . . . who falsely identify Nature's Own as the source or a related brand [2%] from that proportion in the test cell [2%]."  (Id., Ex. A ¶ 14.)  The final number for net confusion was 0%.

The second survey was an array survey.  This survey tries to "simulate[] what happens when a consumer sees both Nature's Pride and Nature's Own in the context of a bread shelf display."  (Pls.' Mot. to Exclude Survey and Expert Report of Philip Johnson, Ex. A, ¶ 7.)  An independent firm conducted interviews at shopping malls in Charlotte, North Carolina; Miami, Florida; Nashville, Tennessee; Phoenix, Arizona; and Tampa, Florida.  There were 300 subjects.  Each subject was shown a photograph "with five different brands of bread (Nature's Own, Nature's Pride, Brownberry, Pepperidge Farm, and Natural Ovens) and were asked whether any of the breads come from the same company."  (Id., Ex. A ¶ 34.)  There was no separate control group.

Instead, the other breads – Brownberry, Pepperidge Farm, and Natural Ovens – were controls.

The results of the array survey showed that the "likelihood of confusion . . . ranges between 0% and 4%, such that there is no significant likelihood of confusion." (Id., Ex. A ¶ 47.)  11% said that NATURE'S OWN and NATURE'S PRIDE came from the same company, with 7% giving that answer for brand name-related reasons. 13% named some other two bread pairing, with 3% giving that answer for brand name-related reasons.  18% said that three or more breads came from the same company.  Johnson noted that "[j]ust about every possible combination [was] named, resulting in an extremely high level of guessing or noise in the survey."  (Id., Ex. A ¶ 45.)  He described two ways of estimating net confusion, which together show that there is between 0% and 4% likelihood of confusion:

> One way would be to compare the percentage who match up only Nature's Own and Nature's Pride (11%) to the percentage who match up some other pair (13%).  This comparison effectively yields no confusion. Alternatively, one could compare the percentage who match up Nature's Own and Nature's Pride for name related reasons (7%) to the percentage who match up some other pair for name related reasons (3%), resulting in a net likelihood of confusion of 4%.  Based on this analysis, the net likelihood of confusion in the Array Survey ranges between 0% and 4%, such that there is no significant likelihood of confusion.

(Id., Ex. A ¶ 47.)

Johnson's testimony is admissible under Rule 702.  After reviewing his expert report, his deposition testimony, and the parties' briefs, the Court concludes that Johnson has sufficient support for his expert opinions and that his testimony will assist the trier of fact.  See Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.2d 833, 844 (11th Cir. 1983) ("[The] alleged technical deficiencies affect the survey's weight, however, and not its admissibility."); 6 McCarthy, supra, § 32:178, at 32-386 ("The proper approach is to view [survey] evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand.").

The Plaintiff has a number of objections to Johnson's testimony.  The Plaintiff says that Johnson focused on source confusion and ignored sponsorship and affiliation confusion.  See 4 McCarthy, supra, § 23:5, at 23-37 ("Source confusion is not the boundary, for actionable confusion includes confusion as to affiliation, connection, or sponsorship.").  But Johnson did look at more than just source confusion.  In the Eveready survey, the subject was asked not only if he or she knew who made the bread, but also whether that company made any other brands.  "It was my intention and is my belief that this question captures [the subject's] beliefs about any potential sponsorship or affiliation or co-branding."  (Johnson Decl. ¶ 7.)  This is consistent with Johnson's past surveys.  He does not always explicitly ask about sponsorship or

affiliation confusion.  (Id. ¶ 9) ("I have conducted other likelihood of confusion surveys in which I did not specifically ask about sponsorship or affiliation, including surveys that I have conducted on behalf of [plaintiffs].").  Even if Johnson is wrong and should have explicitly asked about sponsorship or affiliation confusion, this is not a reason to exclude his testimony.  His testimony would still be reliable and relevant as to source confusion.

The Plaintiff also says that Johnson worded his questions in a way that underestimated confusion.  In the Eveready survey, subjects were asked "[d]o you or don't you know who or what company makes the particular bread that I just showed you?"  (Pl.'s Mot. to Exclude Survey and Expert Report of Philip Johnson, Ex. A ¶ 20) (emphasis added).  The Plaintiff says that Johnson should have used "believe" instead of know.  "[Subjects] may not know an answer, but still believe that an answer is correct."  (Id., at 11.)  The Plaintiff places too much importance on the difference between knowledge and belief.  While philosophers might easily recognize the difference, it is unlikely that it had any significant effect on the subjects in the Eveready survey.  The subjects were shown photographs of bread displays and then asked questions orally.  They probably did not linger on the word "know."

The Plaintiff says that, in McNeil-PPC, Inc. v. Merisant Co., Civil No. 04-1090, 2004 WL 3316380 (D.P.R. July 29, 2004), the court strongly criticized Johnson for

using the word "know" in a survey instead of "believe."  That is an inaccurate description of McNeil-PPC.  The court actually said that "the tortured wording of th[e] question likely contributed to its extremely low response rate.  The question uses the word 'or' four times in a single sentence."  McNeil-PPC, 2004 WL 3316380, at *20. That is not a problem with Johnson's survey in this action.  The court also said that "[i]mmediately prior to the questioning . . . each [subject] was 'admonished' to answer only if he or she 'knew' and not to guess."  Id.  Again, that is not a problem with Johnson's survey in this action.   There is no indication that subjects were "admonished" not to guess.  In any event, the court in McNeil-PPC did not exclude Johnson's testimony from evidence and noted that "courts are loathe to exclude consumer surveys from evidence."  Id., at *12.

The Plaintiff next says that Johnson chose the wrong areas to conduct his Eveready survey.  The interviews for the Eveready survey were conducted in Dallas, Houston, Los Angeles, San Antonio, and San Diego.  The Plaintiff says that it only entered the Los Angeles and San Diego markets in 2008, and its market share is still negligible in these areas.  (Shiver Decl. ¶¶ 18-19.)  The Plaintiff also says that its market share in Dallas is only 15%, whereas in markets like Jacksonville, Florida, its market share is 25% or higher.  Because its market share in Los Angeles, San Diego, and Dallas is minimal, the Plaintiff says that many subjects were probably not aware

of NATURE'S OWN and, therefore, could not have exhibited confusion in an Eveready survey.  But this a limitation on all surveys of this type.  It does not show that Johnson's particular survey used unreliable methods.  There will always be some subjects that are not aware of the senior user's brand, even in areas where the brand has a substantial market share.  And it will often be difficult to find cities that perfectly meet the conditions of an Eveready survey.  As Johnson explains, there were only a few areas that fit the conditions of the survey, and he chose the best combination of those areas:

> [T]he objective of the Eveready Survey was to replicate marketplace conditions.  Namely, the Eveready Survey was designed to measure what happens when consumers who live in markets where Nature's Own is sold are first exposed to Nature's Pride bread. . . .  Because of this objective, it was useful to identify markets where Nature's Own is sold but Nature's Pride is not.  There were relatively few markets that fit those conditions.  Further, the markets in the Eveready Survey included both older Nature's Own markets (Texas) and newer Nature's Own markets (California).

(Johnson Decl. ¶ 13.)  The Plaintiff does not take issue with Johnson's choice of two of the areas: Houston and San Antonio.  Nor does the Plaintiff point out any better areas that Johnson did not use that would have fit the conditions of an Eveready survey.

Lastly, the Plaintiff says that Johnson improperly tabulated the results of the array survey.  Johnson only counted as confused those who said that NATURE'S

OWN and NATURE'S PRIDE came from the same company. He did not include those that said either (a) NATURE'S OWN, NATURE'S PRIDE, and some third or fourth bread came from the same company or (b) NATURE'S OWN and NATURE'S PRIDE both came from one company and some other pair of breads both came from a second company. The Plaintiff says that Johnson should have counted as confused anyone who said NATURE'S OWN and NATURE'S PRIDE came from the same company, regardless of what he or she may have said about other breads. But Johnson has a plausible basis for not treating those answers as confusion. Each of the other breads – Brownberry, Pepperidge Farm, and Natural Ovens – are controls. If an answer includes one of those breads, it suggests that the subject's confusion is not related to brand name similarity. As Johnson explains, "because the Array Survey design juxtaposes two or more brands (a variation on the 'Squirt Design'), it tends to generate high noise levels which must be controlled and adjusted for in the analysis." (Johnson Decl. ¶ 15.)

## IV.  Conclusion

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART the Motion to Exclude Expert Witness Report of Beth A. Chapman [Doc. 124]; DENIES the Motion to Exclude Expert Witness Report and Testimony of Reshma

Shah [Doc. 142]; and DENIES the Motion to Exclude Survey and Expert Report of

Philip Johnson [Doc. 144].

SO ORDERED, this 4 day of August, 2010.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge